**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(Ft. Lauderdale Division)**
**www.flsd.uscourts.gov**

**CORBIN STACY,**

     **Plaintiff,**

Case No. _____

v.

**JETBLUE AIRWAYS CORP.,**

     **Defendant.**

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Corbin Stacy ("Plaintiff" or "Stacy"), by and through undersigned counsel, files this Original Complaint and Demand for Jury Trial against Defendant, JetBlue Airways Corporation ("Defendant" or "JetBlue"), and alleges as follows:

**PRELIMINARY STATEMENT**

1.     The Railway Labor Act 45 U.S.C. §§ 151 *et. seq.* (the "RLA") protects employees in the airline industry from discriminatory and retaliatory adverse employment actions related to the employee's pre-certification union activities *i.e.* advocating for union representation to negotiate a collective bargaining agreement.  Section 1a(2) of the RLA "forbid[s] any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the rights of employees to join a labor organization."  45 U.S.C. § 151a(2).   Corbin Stacy openly advocated for union representation of Inflight crew members (flight attendants) while employed at JetBlue.

JetBlue terminated Mr. Stacy after presenting him with "anonymous" complaints from his co-workers related to his protected union activities and protected social network discussions.  Mr. Stacy seeks (i) reinstatement with all backpay and benefits; (ii) compensatory and punitive damage; (iii) attorneys' fees and costs; (iv) pre-judgment and post-judgment interest (where allowable) and (iv) for a jury trial on all issues so triable.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this case arises under the RLA, 45 U.S.C. §§ 151, *et. seq.*, a federal statute that affects interstate commerce.

3.     Venue properly lies in this judicial district under 28 U.S.C. §1391 because Defendant JetBlue does business in this judicial district.

## PARTIES

4.     Plaintiff Corbin Stacy was a flight attendant for JetBlue from July 2002, until his unlawful termination on November 11, 2015.  He maintains a permanent residence in Ft. Lauderdale, Florida.

5.     Defendant JetBlue is an air carrier engaged in the business of providing air transportation service in interstate and foreign commerce pursuant to certificates of public convenience and necessity issued under the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 *et. seq.*  JetBlue is a "common carrier by air engaged in interstate or foreign commerce" as defined in Section 181 of the RLA, 45 U.S.C. § 181.

## FACTUAL BACKGROUND

*The Beginning -- InFlight Values Committee – Direct Relationship with Management*

6.      Mr. Stacy began his career with JetBlue in July of 2002, as a flight attendant.

7.      JetBlue and its flight attendants created the InFlight Values Committee (the "IVC") in or around 2002, and his peers elected Mr. Stacy as one of the first 7 peer advocate members ever elected to the IVC.   As a peer advocate, Mr. Stacy represented the interests of his fellow flight attendants.

8.      The IVC worked as an internal "union" of sorts to represent the JetBlue flight attendants in discussions with management.  No contract or bargaining agreements were put in place, and the IVC was the practical application of JetBlue's "direct relationship" between all flight attendants and management.

9.      Between 2002 and 2008, the IVC underwent two restructurings.  In or around 2003, Vicky Stennes, the then Vice President of Inflight Servicers, rearranged the IVC into five (5) involvement teams: (i) hotels; (ii) safety; (iii) scheduling; (iv) onboard products; and (v) quality of life.  Mr. Stacy was involved with the scheduling team from 2003 through 2008, and acted as the chair of the scheduling team from 2006-2008.

10.     In or about 2008, the five involvement teams were incorporated into a a new and improved Inflight Values Committee under one chair, with separate and distinct sub-chairs for each area.  The groups began sharing information with each other, whereas they had previously operated independently of each other.  Mr. Stacy was elected as the sole Chairman of the new IVC in 2008.

11.     As chair of the IVC, Mr. Stacy regularly interacted with members of management regarding issues related to the working conditions of JetBlue flight attendants.

12.     The JetBlue flight attendants re-elected Mr. Stacy as chair of the IVC in 2010.  Mr. Stacy, along with Donna Nurmi, was elected as a Co-Chair of the IVC in 2012.

13.     Since the flight attendants and JetBlue did not have a formal agreement in place to govern the resolution of flight attendant disputes and grievances, Mr. Stacy, and the other members of the IVC, were left to address and re-address the same issues, over and over again, on an *ad hoc* basis.  One such issue repeatedly addressed by the IVC was flight attendant seniority, and the attendant pay and compensation issues related thereto.

14.     Although the working relationship between management and the IVC was not perfect, Mr. Stacy remained pro-company for many of the years that he held a seat on the IVC.  Up and until 2012, when asked about union representation, Mr. Stacy would actually advocate for flight attendants to remain patient to allow the direct relationship between the IVC and management to work.

*The Beginning of the End – Rachel McCarthy is Appointed VP of Inflight Services – Seniority Issues Abound*

15.     Rachel McCarthy was appointed Vice President for Inflight Services in or around April of 2012.  As the VP of Inflight Services, Ms. McCarthy was the leader of the JetBlue flight attendants and the face of JetBlue management for flight attendants.

16.     At the time that Ms. McCarthy was promoted to VP of Inflight Services, the Transport Workers Union ("TWU") was in the midst of a card signing campaign to be become the sole bargaining representative, pursuant to the RLA, for all of JetBlue's flight attendants and Inflight crewmembers.

17.      Shortly after Ms. McCarthy's promotion to VP, Mr. Stacy and his Co-Chair of the IVC, Donna Nurmi, were confronted with an issue related to the seniority of

Laura Konopka.  Ms. Konopka, a flight attendant with JetBlue, left her position as a flight attendant and took a position in human resources.  Ms. Konopka's employment outside of Inflight Services should have served to stop her from accruing continued seniority within Inflight Services as a flight attendant.  When Ms. Konopka left human resources and returned to Inflight Services, she was afforded seniority pursuant to a letter agreement with management.  Understandably, this was viewed by many as a violation of the seniority policy contained within the JetBlue Inflight Blue Book Supplement ("IBBS"), or the closest thing that JetBlue flight attendants had to a negotiated contract.

18.    Ms. McCarthy, as VP of Inflight, upheld Ms. Konopka's return to Inflight with full seniority, despite the apparent violation of the IBBS seniority policy.  Ms. McCarthy argued that integrity required Ms. Konopka be reinstated with full seniority since she was granted a special dispensation by management to retain her seniority. Ms. McCarthy argued it would reflect poorly on JetBlue if they did not honor Ms. Konopka's letter agreement.

19.    Based on the manner in which Ms. McCarthy and other members of management handled the violation of the seniority policy, and the lack of transparency, Mr. Stacy, as well as Ms. Nurmi, alerted management to the fact that organizers for TWU were discussing the seniority concerns and using the perceived violation as a means to rally support for their union organizing efforts.  Mr. Stacy even went so far as to state, in an email to Ms. McCarthy, that seniority issues could single handedly drive flight attendants to unionization in a matter of months, and management's lack of transparency regarding seniority left JetBlue vulnerable to third party representation.

20.     Mr. Stacy and Ms. Nurmi soon realized that their direct relationship with management would not be the same so long as Ms. McCarthy was the person in charge of Inflight Services.

21.     In or around August of 2012, Ms. Nurmi and Mr. Stacy were approached by crewmembers that had been asked by JetBlue leaders whether they were pro-union. Mr. Stacy and Ms. Nurmi approached management with their concerns, and were told by Ms. McCarthy that it was inappropriate for a JetBlue leader or manager to ask about a crewmember's stance on unionization at JetBlue.   Despite this knowledge, on information and belief, crewmembers were still asked by leadership what their position was when it came to unionization at JetBlue.

22.     As the months wore on, the working relationship between the IVC and Ms. McCarthy deteriorated.   In or around January 2013, Mr. Stacy and Ms. Nurmi requested a meeting with Robin Hayes, CEO of JetBlue, to discuss a number of issues that they felt were not adequately addressed by Ms. McCarthy, or to which they felt Ms. McCarthy was openly hostile. The agenda was to include discussions of topics concerning Inflight, morale, union activity and accountability of management as a whole. When the meeting did happen, Mr. Hayes proposed that Mr. Stacy and Ms. McCarthy attend "couples counseling" or spend some time on a flight together to get to know one another outside of the work setting.   Needless to say, the meeting did not adequately address the IVC Co-chairs concerns.

23.     At the end of January 2013, Mr. Stacy resigned as Co-chair of the IVC, effective April 1, 2013.  In response, Mr. Hayes sent Mr. Stacy an email thanking him for his many years of service and stating that Mr. Stacy was directly responsible for the ever

increasing levels of professionalism and organization of the committee. Mr. Hayes further lauded Mr. Stacy for making a very significant contribution to building and maintaining the unique culture of JetBlue and for advocating for JetBlue crewmembers over many years.

*Corbin Stacy Becomes Pro-Union and JetBlue Increases Anti-union Animus*

24.     After resigning from the IVC, Mr. Stacy actively sought to aid the union efforts of TWU at JetBlue. Mr. Stacy began carrying union signature cards, and discussing the need for a third-party representative at JetBlue to hold management accountable and to protect the collective rights of JetBlue's flight attendants.

25.     JetBlue was aware of Mr. Stacy's union organizing efforts, as he did not shy away from raising the issue with members of management, especially Ms. McCarthy.

26.     In one such exchange, Mr. Stacy confronted Ms. McCarthy about statements she made at the Inflight Business Meeting held in Fort Lauderdale, Florida on October 30, 2014. Specifically, Mr. Stacy took issue with Ms. McCarthy's statement relating to the union drive of TWU that crewmembers should get the facts "whether or not you are pro-union or pro-company", insinuating to the Inflight crewmembers that you could not be both. Mr. Stacy went on to state that her comments reflected a lack of respect and understanding of the flight attendant's issues.

27.     On or about November 17, 2014, in response to Mr. Stacy's email, Ms. McCarthy wrote back that when a union is trying to get cards signed, she did not believe people could be both pro-union and pro-company. She further stated that a union would only act in its own interest first, and collect generous fees for that privilege.

28.     In addition to Ms. McCarthy's direct animus towards Mr. Stacy and his union activities, as VP of Inflight Services, Ms. McCarthy regularly drafted and circulated informational memos to all members of Inflight regarding union activity.  As time progressed, Ms. McCarthy did not shy away from stating JetBlue's anti-union animus.  One such letter discussed the failings of TWU to successfully negotiate contracts with Allegiant Air, Virgin America and Southwest Airlines.  Within the letter, Ms. McCarthy evidences JetBlue's anti-union animus by stating the following:

> "If you are approached to sign a card, ask for all promises in writing and understand everything is up for negotiation; what is in place today is not a benchmark for where bargaining begins. People will tell you if you like what you have right now, you need a union to protect it; or, if you don't like what you have today, a union can fix it. But again, have a look at what is happening at other carriers – clearly this does not ring true."

See **Exhibit A**.  Letter from VP of Inflight Services.

29.     JetBlue did not hide its anti-union animus.   In fact, JetBlue created a website, dedicated to "educating" the JetBlue flight attendants about the perils of bringing in third party representation.  www.jetbluefacts.com

30.     On the homepage of www.jetbluefacts.com, there is a link to a note from then VP of Inflight Services, Rachel McCarthy.   Ms. McCarthy opens her "note" by stating: "I've always been very clear on my position when it comes to third party representation: I don't believe we need it. I'm passionate about our Crew having the full story when it comes to unions, particularly when we hear about Crewmembers being pursued to sign interest cards."   As the leader of JetBlue's 3200 flight attendants, Ms. McCarthy unabashedly states she does not believe third party representation is needed, and ends her "note" by stating: "Please keep yourself educated on the facts, facts are

stubborn! I sincerely hope you can agree with me on signing up just for JetBlue – and no one else." See **Exhibit B**, Note from Rachel.  http://www.jetbluefacts.com/note-from-Rachel.html.

31.     In other areas of the www.jetbluefacts.com website, the company reiterates over and over again that union representation does not mean better working conditions for flight attendants. On the Need To Know page (http://www.jetbluefacts.com/need-to-know.html), JetBlue states, in reference to the flight attendant posed problem "I want to be paid more" that "[n]egotiations don't start at your current pay rate and move upwards. Let's say the union requests higher base pay. During negotiations, the union would likely have to give up other things in a trade-off for more pay because nothing is given away for free. This could mean less money for healthcare or no uniform allowance, for example." *See* id.  In essence, JetBlue is stating that if the flight attendants vote to bring in a union, such as TWU, to negotiate a contract, flight attendants *will* lose various aspects of their current compensation system. (emphasis added).

32.     On another page, Get to Know TWU (http://www.jetbluefacts.com/get-to-know-twu.html), JetBlue outlines 7 bullet points regarding TWU, arguing that TWU is not the right union to represent the JetBlue flight attendants:

- Flight attendants aren't their specialty;
- They don't always have something nice to say;
- Who knows what your dues will fund;
- Not everyone is a fan;
- Things are black and white (arguing Southwest flight attendants can be fired if they don't pay their TWU dues);
- They will agree to things you don't like; and
- They have received some bad press.

33.     Based on the foregoing, JetBlue clearly harbored anti-union animus toward TWU.

*JetBlue Initiates Fact-Finding Meeting with Mr. Stacy on September 11, 2015*

*Pertaining to Alleged Complaints Received from Crewmembers Regarding Email and*

*Social Media Posts of Mr. Stacy*

34.     On September 11, 2015, Mr. Stacy met with Rob Stillman, Manager of Crew Relations in Ft. Lauderdale, Florida.

35.      In that meeting, Mr. Stillman shared with Mr. Stacy that JetBlue had received approximately 12 complaints against Mr. Stacy relating to emails and social media posts Mr. Stacy made in July of 2015.

36.     The 12 complaints were as follows:

- "he has an increasing lack of respect and decorum, causing tension and animosity among the inflight attendant ranks;"
- Crewmembers are scared of him, because they feel he will bash them on facebook; he makes it personal;
- His messages derails the work that inflight has done to improve the quality of life for our Crewmembers;
- He has a complete disregard for the chain of command as if to say "I am stronger than these leaders;"
- He exerts inappropriate influence over Crewmembers by attempting to discredit our JB Leadership on social media and in emails;
- He is creating a hostile work environment; he is toxic and it's getting worse;
- He greets you with hostility when you question him and what he says;
- His tone and accusations are disrespectful, condescending, confrontational and completely out of line;
- He berated me; he is a loose cannon;
- I find his emails to be appalling, disrespectful and disgusting;
- He did not have permission to share those emails with others on facebook;
- Another crewmember expressed a concern for their personal safety due to what they characterized as the aggressive manner of your communications, fearing possible physical harm.

37.     Mr. Stillman later clarified by email, that the meeting was the company's chance to share with Mr. Stacy the perceptions and reactions fellow Crewmembers had to his communications.   Mr. Stillman further stated that the meeting was purely a fact finding discussion and that Mr. Stacy was not being disciplined or coached, as those terms are understood in JetBlue culture and documentation.

38.     Although Mr. Stillman referenced July 2015 social media posts and emails, he failed to identify specifically which posts were in question.  Notwithstanding this fact, Mr. Stacy was asked for additional information regarding the alleged complaints. Understandably, without any further context, Mr. Stacy was unable to provide additional information.

39.     A review of some of Mr. Stacy's social media posts from July 2015 show that Mr. Stacy did in fact post a string of emails between Mr. Stacy, Donna Nurmi, John Culp, Rachel McCarthy, the IVC groups and others, relating to issues of seniority.  See **Exhibit C**, Facebook Post to JetBlue Inflight Crewmembers private page from July 21, 2015.

40.     Mr. Stacy precedes his posting of the email string by stating, "Here you go, folks!  This is YOUR Direct Relationship! We can not "reply to all" on a topic so important such as OUR SENIORITY, and you still do not answer the questions because the IBBS was NOT FOLLOWED!  Read from the bottom up!".  *See* Id.

41.     In response to multiple comments, Mr. Stacy further clarifies the significance of the need for all Inflight crewmembers to have access to their seniority lists by stating, "It's beyond silly!!! We are over 15 years old ... The Pilots have a direct link to their seniority which is LIVE ... We get a printed copy in the Crew Lounge every six

months and can't even get a copy of it when we ask for it, yet they can do whatever the heck they want??? These are the people who have our livelihoods and quality of life in their hands?! We need to TAKE BACK CONTROL of our destiny!!!! SIGN YOUR CARDS!!!"  See, Exhibit C .

42.     Also on July 21, 2015, Mr. Stacy commented on a post made by Aranka Werlein-Orellana, wherein she posted an email from Nancy Elder (VP of Communication) and Rachel McCarthy (VP of Inflight Services), apparently apologizing for JetBlue's handling of press related to flight 167 referencing "Crewmember error" and their regret that it came across as "throwing the Crewmember under the bus."  See **Exhibit D**, Facebook post to JetBlue Inflight Crewmember closed group.    Mr. Stacy stated, "Knowing her the way I do ... I can read between the lines ... It's basically asking people not to sign their cards - period! It's not at all our caring value at play! Sad!"  *Id.*

43.     At worst, Mr. Stacy's comments to a closed and private group of JetBlue's flight attendants and Inflight crew reflect his distrust of then current management, but do not rise to the level of the alleged "complaints" accusing him of being threatening, bullying, and a danger to his fellow co-workers.  In fact, Mr. Stacy's comments to a closed group are clear union-organizing activity as he constantly makes reference to signing union cards, and is protected speech.   See also, **Exhibit E**, Facebook post to JetBlue Inflight Crewmembers private page, August 10, 2015 (robust discussion from many Inflight Crewmembers, including Mr. Stacy, discussing the perceived shortcomings of the IVC and whether a union would be beneficial).

44.     Additionally, Mr. Stacy and Ms. Nurmi, requested meetings with Ms. McCarthy to discuss the perceived violations of the IBSS with respect to seniority issues

and the printing of seniority lists, but Ms. McCarthy failed to respond to such requests. Since they received no response, Mr. Stacy and Ms. Nurmi set a meeting with Robin Hayes, JetBlue CEO, to discuss.   Before the meeting could take place, Mr. Stacy was presented with the above listed complaints.

45.     Despite the fact that many Inflight Crewmembers engage in discussions on social media related to management actions, Mr. Stacy was targeted and made an example of, chilling such discussions.  As a former IVC Chair, Co-Chair and senior flight attendant with 13 years of experience Mr. Stacy was simply made an example of by management, for his vocal pro-union stance.

*Mr. Stacy Files a Discrimination and Hostile Work Environment Claim against JetBlue and Rachel McCarthy related to his Pro-Union Activity and is Terminated on November 12, 2015.*

46.     On September 11, 2015, the same day that Mr. Stacy was presented with the alleged complaints, he made a formal written complaint to Rob Stillman stating that Rachel McCarthy subjected him to harassment and discrimination.

47.     Mr. Stacy further stated that he felt that Ms. McCarthy targeted him because of his vocal stance on the lack of integrity from the Inflight Leadership Team and the fact that he is an official union organizer.

48.     After Mr. Stacy requested an investigation into his discrimination and retaliation claims, he was told that the company was taking his concerns seriously and would conduct two parallel investigations related to his complaints.

49.     On information and belief, in October 2015, the company concluded that Mr. Stacy's allegations were "unsubstantiated."

50.     On or about November 11, 2015, Mr. Stacy received a phone call from Mr. Stillman and John Culp stating Mr. Stacy would be terminated effective November 12, 2015.

51.     On or about November 12, 2015, Mr. Stacy received a letter at his home, terminating his employment effective the same date, for among other things, violation of section 3.4 of the Crewmember Bluebook: Progressive Guidance and Performance Expectations, Abusive or inconsiderate treatment of customers, fellow crewmembers, business partners and visitors; insubordination; and abusive or inappropriate language or actions.

52.     On or about December 9, 2015, Mr. Stacy initiated JetBlue's post-termination review within the allotted thirty-day time-frame.

53.     On or about December 18, 2015, Mr. Stacy was informed that JetBlue had conducted a full and comprehensive review of his termination and concluded that his termination for violation of company policy would be upheld.

## CAUSES OF ACTION

### (Violations of the Railway Labor Act, 45 U.S.C. § 152, Third & Fourth)

54.     The allegations contained in paragraphs 1-53 above are incorporated by reference as if fully set forth herein.

55.     Section 1a(2) of the Act "forbid[s] any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the rights of employees to join a labor organization." 45 U.S.C. § 151a(2).

56.     Section 2 of the RLA fleshes out this protection.   Section 2, Third provides that employees may select their representatives "without interference, influence, or coercion" of "any" kind.  *Id*. § 152, Third.  Section 2, Fourth further provides that:

> No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to inter-fere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

*Id*. § 152, Fourth.   "These provisions prohibit employers from interfering with, coercing or influencing the representational choices of workers and from interfering with the right of employees to organize in labor unions."   ALPA v. Eastern Air Lines, Inc., 863 F.2d 891, 893 (D.C. Cir. 1988).

57.     Since approximately 2010, the Transit Workers Union has been in the middle of an organizing campaign at JetBlue to have the union selected as the flight attendant's exclusive bargaining representative.

58.     Mr. Stacy was engaged in activity protected by the RLA in support of TWU prior to his termination on November 12, 2015.

59.     JetBlue management was aware of Mr. Stacy's protected activities.

60.     JetBlue harbored animus toward Mr. Stacy's activities in support of TWU.

61.     JetBlue's animus towards Mr. Stacy's protected activities was a causal factor in his termination.

62.     JetBlue has violated Section 2, Third and Fourth of the RLA by terminating Ms. Stacy.  JetBlue interfered with and denied Mr. Stacy's guaranteed rights

under the RLA to organize and assist in the organizing of the labor organization of his choice.

## DAMAGES

63.    As a direct and proximate cause of Mr. Stacy's unlawful termination, JetBlue's unlawful actions have caused Mr. Stacy to suffer the following damages:

a.  Loss of earnings and benefits as a JetBlue flight attendant including salary, 401(k) matching benefits, profit sharing , seniority, sick leave, vacation, travel and health benefits;

b.  Loss of earnings capacity and career opportunity in the airline industry;

c.  Mental and physical anguish due to his termination and loss of reputation.

## PRAYER FOR RELIEF

For these reasons, Plaintiff Corbin Stacy asks for judgment against Defendant JetBlue for the following:

a.  Reinstatement to his position as a JetBlue flight attendant, with full seniority and all backpay and benefits owed Mr. Stacy from the date of his termination;

b.  Prejudgment and postjudgment interest;

c.  Punitive damages to remedy the deliberate and willful violation of Mr. Stacy's statutory right to organize and assist in organizing the labor representative of his choice under the Railway Labor Act, 45 U.S.C. §§ 152, Third and Fourth;

d.  Reasonable attorneys' fees and costs in prosecuting this suit;

e.   Any and all other relief the Court deems appropriate at either law or in

equity.

## DEMAND FOR JURY TRIAL

Plaintiff, Corbin Stacy, hereby makes demand for trial by jury on all issues so

triable pursuant to the Seventh Amendment to the United States Constitution and Rule 38

of the Federal Rules of Civil Procedure.

DATED: March 11, 2016


Respectfully submitted,

**MORGAN & MORGAN, P.A.**
*Attorneys for Plaintiff*
600 N. Pine Island Road
Suite 400
Plantation, Florida 33324
Tel.    (954) 318-0268
Fax.    (954) 327-3017

By:    /s/ *Paul M. Botros*
        Paul M. Botros, Esq.
        Fla. Bar No. 63365
        pbotros@forthepeople.com